UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH R. WATSON,                         Case No. 14-14124

          Plaintiff,                  Denise Page Hood
v.                                        United States District Judge

WILLOW ENTERPRISES, INC., d/b/a           Stephanie Dawkins Davis
PORT HURON HOSPITAL INDUSTRIAL            United States Magistrate Judge
HEALTH, *et al*,

          Defendants.
_____/

## REPORT AND RECOMMENDATION
## MOTION FOR SUMMARY JUDGMENT (Dkt. 30)

## I.   PROCEDURAL HISTORY

Plaintiff filed this prisoner civil rights action on October 27, 2014.  (Dkt. 1).

District Court Judge Denise Page Hood referred this matter to the undersigned for

all pretrial purposes on March 28, 2016.  (Dkt. 31).  The motion for summary

judgment was filed on March 17, 2016 by Willow Enterprises, Sarah Kading, and

Brandi Schieman.  (Dkt. 30).  Plaintiff filed a response on April 7, 2016.  (Dkt.

32).  The parties filed their joint statement of resolved and unresolved issues on

August 9, 2016.  (Dkt. 36).  A hearing was held on November 3, 2016, pursuant to

notice.  (Dkt. 38).  This matter is now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that

defendants' motion for summary judgment be **GRANTED**.

## II.   FACTUAL BACKGROUND

This case involves a single count complaint alleging an Eighth Amendment claim based on Willow Enterprises, Inc., d/b/a Port Huron Hospital Industrial Health's employees, Sarah Kading, L.P.N. and Brandi Schieman, L.P.N.'s alleged failure to provide plaintiff's medications to him, while he was incarcerated in the St. Clair County Jail ("SCCJ"), related to a parole violation, from July 23-28, 2012. Willow Enterprises provided nursing staff to the St. Clair County Jail, via contract with St. Clair County, in 2012. Plaintiff alleges that Kading and Schieman failed to provide him with his medications, each night, from July 23-27, 2012. Plaintiff was incarcerated at the St. Clair County Jail, on July 23, 2012, for a period of 20 days, for a probation violation. (Dkt. 30, Ex. B, St. Clair County Jail Inmate Record). At the time of his incarceration, plaintiff filled out a Medical Screening Form. (Dkt. 30, Ex. C, St. Clair County Jail Medical Screening Form). The Medical Screening Form indicated that plaintiff "states heart disease and high blood pressure - takes 12 different medications - see hand written med list attached to his medical sheet/booking folder." *Id*. However, defendants point out that there was no suggestion on the medical screening form, that plaintiff had any active cardiac symptoms, when he was admitted to the St. Clair County Jail. *Id*.

At his deposition, plaintiff testified that he provided the handwritten list of

his medications, on his incarceration.  (Dkt. 30, Ex. D, pp. 25-26; Ex. E -

Handwritten List of Joe's Meds).  He also testified that he made numerous

requests for his medications while incarcerated. Plaintiff claims that he asked the

nurse working med pass about his medications the first night, and she responded

she would look into it.  (Dkt. 32, Ex. 2, p. 15). The second night, he again waited

in line at med pass and was told by a different nurse that there were no

medications for him.  *Id*. at pp. 16-17.  He told her and the officer next to her that

he needed to have his medication. *Id*.  On the third night, the nurse working med

pass was the same nurse who was working med pass the first night.  *Id*. at 17.

Plaintiff again asked for his medications and was again told that there were no

medications for him. Plaintiff again stated that he needed his medications, to

which the nurse did not respond.  *Id*. at pp. 17-18.  By this time, plaintiff testified

that he was getting "panicky" about his medications.  *Id.* at p. 18.  On the fourth

night, plaintiff received four medications. According to plaintiff, none of them

were for his blood pressure or his heart.  *Id*. at p. 23; Dkt. 32, Ex. 13.  He was

given Lasix, Allopurinol, Zantac, and Paxil.  (Dkt. 32, Ex. 13).  Lasix is a diuretic,

Allopurinol is for gout, Zantac is for acid reflux, and Paxil is an antidepressant.

(Dkt. 32, Ex. 6, pp. 52, 62, 63).  On the fifth night, he received the same four

medications.  He again stated to the nurse on duty that he had a "heart

problem"and needed his medications.  (Dkt. 32, Exhibit 2, pp. 70-71).  The nurse

working med pass again stated that she would look into it.  *Id*. at p. 71.  Schieman was working med pass on the fourth and fifth nights.  (Dkt. 32, Ex. 13; Ex. 14, pp. 27, 11).

Kading and Schieman testified that they could not provide medications to an inmate, based solely on a handwritten list.  (Dkt. 30, Ex. F, pp. 12-13, 32, 35, 49; Ex. G, pp. 23-25, 34-35).  Rather, they could only provide medications, if verified by an active prescription with a pharmacy or by an active prescription bottle. (Dkt. 30, Ex. F, pp. 12-13, 32, 35, 49, 52, 54, 60-64, 66-67; Dkt. 30, Ex. G, pp. 7-8, 13, 22-29, 34-35, 37-39).  If they could not verify a given prescription as being active, they could not provide that medication.  (Dkt. 30, Ex. F, pp. 12-13, 32, 35, 49; Ex. G, pp. 23-25, 34-35).  According to plaintiff, if inmates used multiple pharmacies, Willow employees still only contacted the last pharmacy that the inmate used. (Dkt. 32, Ex. 6, p. 12).  Kading and Schieman both testified that they determined the last pharmacy used by asking the inmate. (Dkt. 32, Ex. 6, p. 49; Ex. 14, p. 7).  They also explained that if an inmate had a concern regarding the need for a medication, the inmate could fill out a Medical Request Form, asking to be seen by the physician.  (Dkt. 30, Ex. F, pp. 53-54; Ex. G, pp. 25-26, 39; Exhibit H, St. Clair County Medical Request Form).

One of the physicians contracted by St. Clair County, Reid Stromberg, D.O. was at the St. Clair County Jail on July 24, 2012.  (Dkt. 30, Ex. I - St. Clair County

4

Intervention Center Physician's Orders). Dr. Stromberg signed the Physician's Orders regarding plaintiff's prescriptions for Lasix, Allopurinol, Zantac and Paxil, on July 12, 2012. Those medications were then provided to plaintiff. (Dkt. 30, Ex. J, St. Clair County Intervention Center Medication Administration Record). While plaintiff was incarcerated, he received treatment at "The People's Clinic" because he did not have insurance. (Dkt. 32, Ex. 2, pp. 83-84). St. Joseph Mercy Hospital is a co-sponsor of The People's Clinic. (Dkt. 32, Ex. 17). Records from The People's Clinic verify that, at the time of his incarceration, plaintiff was taking all of the medications on the list that he provided. (Dkt. 32, Ex. 17(A)). If there is a current, active prescription for medications provided to an inmate, Willow employees do not need any approval to provide those medications to that inmate. (Dkt. 32, Ex. 6, p. 56). Plaintiff testified that nobody asked him where he got his prescriptions filled while he was at SCCJ. (Dkt. 32, Ex. 2, pp. 104, 143).

The medical screening form for each inmate is provided to Willow employees the same day that the inmate arrives at SCCJ. (Dkt. 32, Ex. 6, p. 29; Ex. 14, p. 22). Willow employees receive the medical screening form and prepare the medical administration record and the physician's orders for medications immediately afterward. (Dkt. 32, Ex. 6, pp. 46-47). Kading testified that she made contact with inmates based on what is in their medical screening form if she had questions for them. (Dkt. 32, Ex. 6, p. 32). She testified that she could

"always"make a call to where the inmate was housed and have the deputy there ask inmates any questions she might have. *Id*. at pp. 49-50. She does not recall having done so in Plaintiff's instance. *Id*. at p. 50. Kading testified that, if "heart disease" was circled on an inmate's medical screening form, she would order medications within the first 24 hours of that inmate arriving at SCCJ. *Id*. at pp. 30-31. She further testified that she would "make sure" that in this instance, the inmate has their medications. *Id*. Although she agreed that "heart disease" is a general term, Kading does not ask any further questions regarding this unless the inmate is symptomatic. *Id*. at pp. 33-34.

Schieman testified that she would review the information taken during booking and speak with the inmate. (Dkt. 32, Ex. 14, p. 22). Plaintiff testified that he was "100 percent sure" that nobody spoke to him about his medical issues. (Dkt. 32, Ex. 2, p. 143). Kading testified that if plaintiff had been in line for med pass and she did not have his medications, she would write down any issues and "look into it further." (Dkt. 32, Ex. 6, p. 38). Looking into it further, according to Kading, meant that she pulled the inmate's chart to see if the medications had been ordered, or whether she needed to call to verify the medications, which she would do if that was what was necessary. *Id*. at p. 38. She testified that she only advised inmates why there were no medications for them if she saw them again on the same day. *Id*. at p. 38.

If an inmate completed a medical request to see a physician, it would be in the inmate's medical file.  *Id*. at Ex. 6, p. 31.  Kading testified that she could not recall whether she gave plaintiff a medical request form.  *Id*. at pp. 53-54. However, if a Willow employee instructed an inmate that they should see a physician, that information would "not always" be in the inmate's file.  *Id*. Schieman testified that "anything pertaining to anything that was going on with the inmate that needed to be documented would be documented." (Dkt. 32, Ex. 14, p. 17).  She first testified that notes did not only encompass emergencies, and then testified that she only documented emergency situations.  *Id.* at pp. 17-18. She then testified again that nurse's notes are "anything that goes on with a patient or inmate that needs to be addressed by the doctor.  *Id*. at p. 21.

Plaintiff points out that there is no medical request form in his file, nor is there any notation indicating that he was complaining about not receiving his medications or that he was asked to fill out a medical request form.  (Dkt. 32, Ex. 19).  Plaintiff testified that he never completed a request to see a doctor and that he did not know the procedure to do so.  (Dkt. 32, Ex. 2, pp. 106, 117).  He testified that each time he spoke with the nurses, they only responded that they would look into the issue.  *Id.* at p. 81.  Jail physicians were available to Willow employees via a pager system.  Kading testified that they responded to Willow employees at SCCJ within thirty minutes.  (Dkt. 32, Ex. 6, pp. 15-16).  Schieman testified that

the physicians were available to them "24/7,"and that she spoke to them "daily" when she worked.  (Dkt. 32, Ex. 14, pp. 12-13).

On the morning of July 28, 2012, roughly two weeks into his stay at the jail, plaintiff suffered a myocardial infarction.  (Dkt. 30, Ex. K, St. Clair County Jail Incident Report, dated 7/28/12).  At that time, Kading was called by the Sheriff's Deputy, to attend to plaintiff.  *Id.*  Kading evaluated plaintiff, gave him Nitro and monitored his condition, until EMS arrived.  (Dkt. 30, Ex. L).  Plaintiff was taken to Port Huron Hospital, where he underwent treatment for the myocardial infarction.  He was treated in the ER by Dr. Elias Skaf.  (Dkt. 32, Ex. 2, p 75; Ex. 15).  Dr. Skaf dictated a progress note the following day making a plan for plaintiff, which included both smoking cessation and the continuation of his medical treatment.  (Dkt. 32, Ex. 16).  Dr. Skaf prepared a letter for plaintiff's medical records regarding plaintiff's treatment as well, stating that the heart attack was "related to multiple reasons including the lack of medications and significant history of smoking."  (Dkt. 32, Ex. 15).  Dr. Skaf's letter concludes that, while it was difficult to know the exact reason for Plaintiff's heart attack, it was "multifactorial and related to multiple issues … including medications compliance, smoking, diet, and lack of exercise."  (Dkt. 32, Ex. 15).  He was discharged from Port Huron Hospital on July 31, 2012, without any significant complications, according to defendants.  (Dkt. 30, Ex. M - Port Huron Hospital

8

Discharge Summary dated 7/31/12).

## III.   ANALYSIS AND CONCLUSIONS

### A.   Legal Standards

#### 1.   Summary Judgment

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the movant establishes the lack of a genuine issue of material fact,

the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

### 2.   Eighth Amendment

The Supreme Court has recognized the responsibility of the courts "to scrutinize claims of cruel and unusual confinement." *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981). The Court has recognized the deliberate indifference to a prisoner's serious medical needs as one type of conduct that violates the Eighth Amendment is a prison official's. *See e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). To succeed on a claim of deliberate indifference, a plaintiff must satisfy two elements, one objective and the other subjective. He must show that he had a serious medical need and he must

11

show that defendants, while aware of that need, acted with deliberate indifference to it. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991).

The second element of *Wilson*, "deliberate indifference" has been variously defined by the federal courts that have considered prisoners' Eighth Amendment claims, but all agree that it is more than mere negligence and less than actual intent in the form of a "malicious" or "sadistic" action. *Farmer v. Brennan*, 511 U.S. 825, 861 (1994); *see also Estelle*, 429 U.S. at 105-106 (a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment; "medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (deliberate indifference is the equivalent of "criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm"); *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) ("Obduracy or wantonness, not inadvertence or good faith error, characterizes deliberate indifference.").

As noted in *Estelle*, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. An allegation of mere negligence in diagnosis or treatment is not actionable under § 1983. *Estelle v. Gamble*, *supra*; *Byrd v. Wilson*, 701 F.2d at 595 n. 2. In *Whitley v. Albers*, 475 U.S. 312 (1986), the Court

12

held that "[i]t is obduracy and wantonness, not inadvertence or error in good faith"
that violates the Eighth Amendment in "supplying medical needs."  "A defendant
must purposefully ignore or fail to respond to a prisoner's pain or possible medical
need in order for deliberate indifference to be established." *McGuckin v. Smith*,
974 F.2d 1050, 1060 (9th Cir. 1992).  The deliberate indifference standard
requires knowledge of the particular medical condition in order to establish an
intent ("a sufficiently culpable state of mind," *Wilson*, 501 U.S. at 298) to deny or
to delay purposely "access to medical care" or intentionally to interfere "with the
treatment once prescribed." *Estelle*, 429 U.S. at 104-05.  Thus, "[k]nowledge of
the asserted serious needs or of circumstances clearly indicating the existence of
such needs, is essential to a finding of deliberate indifference." *Horn ex rel. Parks
v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir.), *cert. denied*, 513 U.S.
873 (1994).

      B.    <u>Verification of Prescriptions</u>

         1.    Parties' Arguments

In this case, defendants assert that plaintiff has failed to create a genuine
issue of material fact as it relates to the subjective "deliberate indifference"
element of an Eighth Amendment claim.  Plaintiff has admitted that the nurses
who provided him with medications were professional during their interactions
with him.  (Dkt. 30, Ex. D, pp. 15-20, 22-26, 69-72).  Plaintiff testified that the

nurses were responsive to his requests for information regarding his medications. (Dkt. 30, Ex. D, pp. 15, 16, 17-20, 23-24, 69-71). When medications were not provided, the nurses told him that they would look into the issue. (Dkt. 30, Ex. D, pp. 15, 17-20, 71). Nurse Kading and Nurse Schieman have testified that they could only fill prescriptions, which could be verified by an active prescription or by an active prescription bottle. (Dkt. 30, Ex. F, pp. 12-13, 32, 35, 49, 52, 54, 60-64, 66-67; Ex. G, pp. 7-8, 13, 22-29, 34-35, 37-39). According to defendants, it is undisputed that Kading and Schieman took steps to identify plaintiff's active medications, since his prescriptions for Lasix, Allopurinol, Zantac and Paxil were verified, ordered by Dr. Stromberg and were provided. (Dkt. 30, Ex. I; Ex. J) .

Defendants maintain that plaintiff could have been seen by a physician, concerning his medication issue, if he had made such a request. (Dkt. 30, Ex. F, pp. 53-54; Ex. G, pp. 25-26, 29; Ex. H). Dr. Stromberg was at the St. Clair County Jail on July 24, 2012 and signed the orders for plaintiff's active prescriptions that could be verified. (Dkt. 30, Ex. I). Those medications were then provided to plaintiff. (Dkt. 30, Ex. J). Plaintiff has failed to show that Kading and Schieman acted with "deliberate indifference" and with a "sufficiently culpable state of mind" with regard to plaintiff's medications, as (1) the defendant nurses took steps to verify plaintiff's active medications; (2) identified the known active medications; and (3) provided the information resulting in Dr. Stromberg signing

14

the orders to provide these medications. Defendants insist that there has been no showing that Kading and Schieman acted with conscious disregard, in attempting to verify plaintiff's known active medications, having a physician order the medications and provide the medications to plaintiff.

According to plaintiff, the facts show that he advised at least four individuals of his heart problem and his medications, Kading and Schieman being two of those four. Each night that plaintiff was denied the medications related to his heart condition, he advised the nurse working med pass that he needed his medication. On the fourth and fifth nights, he reiterated that he had a heart problem. From plaintiff's testimony, the medical administration chart, and the notes from the date that plaintiff suffered his heart attack, Kading would have been working med pass on the first and third nights of his incarceration. Schieman would have been working on the second, fourth, and fifth nights. Kading also would have had knowledge of plaintiff's conditions and medications because she would have received his medical screening form the day that he arrived at the jail. If she had questions, she could have made a call to where plaintiff was housed, but she does not recall having done so with regard to plaintiff, and plaintiff is "100%" sure that nobody spoke to him about his medical condition.

According to plaintiff, although Kading testified that the four medications dispensed to plaintiff were the only four that were verified by the pharmacy that

she contacted, the records from The People's Clinic verify that plaintiff was taking all of the medications on his list at the time of his incarceration.  While Kading and Schieman both testified about what they would have done in the event that a medication list was not fully verified by a pharmacy or in the event that an inmate complained about not receiving his medication, plaintiff says that neither offered any testimony with regard to what they did in plaintiff's instance.  Further, plaintiff testified that nobody asked him where he got his medication filled and no one ever informed him of the procedure to request an examination by a physician. Schieman testified that she would have provided the medical request form (to see a physician) only if inmates raised an issue, stating that they are "responsible for their own health."

Willow employees were required to immediately report any condition that posed a danger to inmate health and safety.  Schieman testified that this would consist of "anything abnormal."  There is no medical request form in plaintiff's file and there is no notation that he was instructed to fill one out, despite testimony that "anything pertaining to anything that was going on with the inmate that needed to be documented would be documented" and that notes would have included "anything that goes on with a patient or inmate that needs to be addressed by the doctor."  Physicians were available to Kading and Schieman "24/7"and Schieman spoke to them "daily" when she worked.

16

Plaintiff advised multiple times that he had a heart problem and high blood pressure.  Kading testified as to the function of each of the four medications for which they had verification, and thus, would have known that none of those medications were for the treatment of plaintiff's heart condition.  Conversely, she would have known at least some of the medications that she was not able to verify were for the treatment of plaintiff's heart condition.  Still, neither Kading nor Schieman discussed this with plaintiff or a physician, despite the fact that both plaintiff and the jail physicians were easily accessible to Willow employees.  Further, plaintiff testified that he did not know the procedure to request to see a jail physician, which, according to plaintiff, is consistent with Schieman's testimony that the inmates "are responsible for their own health."

When prison medical providers are aware of a prisoner's obvious and serious need for medical treatment, yet delay medical treatment for non-medical reasons, their conduct in causing the delay creates a constitutional infirmity.  *Blackmore*, at 899.  Plaintiff relies on *Potvin v. City of Westland Police Dep't*, 2006 WL 3247116 (E.D. Mich. 2006), in which the plaintiff informed the defendant police officers when arrested that she needed to take heart medication every four hours.  She supplied pills that were neither labeled nor stored in a marked container.  She was released the next morning, and was told that her pills had either been lost or destroyed.  The Court found that, viewing the evidence in

17

the light most favorable to plaintiff, there was evidence that the officers either 1) destroyed or discarded her medication; or 2) knew of her medical condition and disregarded it, thus satisfying the "subjective" prong of the deliberate indifference analysis. The court further found that it was significant that the defendants offered no rebuttal evidence to the plaintiff's testimony. *Potvin*, at \*10. In this case, plaintiff informed four different officials that he needed medication for his heart, and provided one bottle and a list of the remainder of the medications. While he was not told that his pills were lost or destroyed, he still did not receive them. Defendants repeatedly testified that they could not recall what they did in plaintiff's specific instance, and thus, by plaintiff's account, they have offered no rebuttal to plaintiff's testimony.

Plaintiff next relies on *Flores v. Lenawee Cty.*, 2008 WL 4601404 (E.D. Mich. 2008), in which the plaintiff was a diabetic and a heroin addict who also had a heart condition. She was initially denied medications because she was deemed to be under the influence of alcohol or drugs. *Id*. at \*2. When a family member brought Flores' medication in a bag, there was insulin as well as several bottles of pill prescriptions. *Id*. at \*3. One of the officers gave Flores her insulin, but none of the other medication because "the meds were twice a day," and Flores' medications were brought after the designated time to administer them to her. *Id*. at 9. One officer testified that he did not think to call a nurse or doctor because it

18

was not his responsibility. *Id*. at *5. Flores told another officer that she "needed her meds," and was ignored. *Id*. Another officer failed to give Flores her medication at the usual time, but had no idea that she had heart issues. *Id*. at *6-7. Flores died in her cell after she suffered a heart attack. *Id*. at *7. The physician performing the autopsy concluded that her death was caused by a number of issues unrelated to her heart, including her own drug abuse, diabetes, and a history of high blood pressure. *Id*. at *7-8. The court acknowledged that none of the officers could have known that Flores had a heart condition. *Id*. at *7. Nonetheless, the court denied summary judgment with as to certain defendants. Regarding one defendant in particular, the Court held that "[although] Borton testified that he had no idea Flores had a heart condition, it was reckless to delay Flores' receipt of insulin and other medications, particularly when he knew that Flores had been begging for her medications throughout the morning." *Id*. at *15. In *Flores*, the inmate's heart condition was not known to anyone. Her death was also attributable to factors other than the denial of her medications. Notwithstanding, the court still allowed plaintiff's claims to go forward, noting that denying Flores her medications when she repeatedly requested them was reckless. According to plaintiff, the same logic applies here, except the officials in question did know about plaintiff's heart condition. Yet, they still denied him his medications even though they knew that he had been asking for them.

19

Finally, plaintiff relies on *Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006), where the prisoner in question died after being denied treatment for dehydration and mental illness.  In determining motions for summary judgment regarding eleven of the prison officials, the Sixth Circuit made note of the fact that many of them did not ensure that the prisoner received medical treatment.  *Id*. at 288-289.  Regarding one official, the court specifically noted that, after recognizing that the prisoner needed treatment, the official completed a referral form and then testified that after "healthcare was contacted, I left it at that."  *Id*. (Additionally noting that "these defendants pin much of their defense on the fact that they (or others) had completed psychological-referral forms."  *Id*. at 290). The 6th Circuit denied summary judgment to eleven of the officers, reasoning that "None of this, to be sure, establishes that these defendants either singly or as a group showed deliberate indifference to Clark.  For summary-judgment purposes, we hold that… these 11 defendants could have perceived a substantial risk of serious harm to Clark."  In this case, Kading and Schieman insist that they "would have" offered a medical request form to plaintiff if his medications did not verify appropriately, or if he complained at med pass.  Plaintiff counters that even if this is true, the Sixth Circuit's ruling makes it clear that relying on the request for medical services is not sufficient to ensure that plaintiff received adequate treatment.  In any event, plaintiff testified that he was not offered this form, that he

20

did not know the procedure for requesting an appointment with a physician, and
that Kading and Schieman only testified that they would "look into it."

In reply, defendants maintain that plaintiff has still failed to establish a
genuine issues of material fact. They posit that even assuming, for sake of
argument, that plaintiff is correct that Kading and Schieman were professionally
negligent in failing to verify all of plaintiff's prescriptions that negligence still
fails to rise to the level of an Eighth Amendment violation. According to
defendants, plaintiff seeks to hold them to an impossibly high standard.
Defendants point out that it took plaintiff and his counsel until October 9, 2015
(one year after the complaint was filed) to obtain all of plaintiff's prescription
records themselves. (*See* Dkt. 32, Ex. N). Yet, plaintiff asserts that defendants
should have been able to do so in a matter of days. Defendants reiterate that they
did, in fact, take steps to verify plaintiff's prescriptions and only those that could
be verified were provided. Thus, according to defendants, there is no genuine
issue of material fact sufficient to sustain an Eighth Amendment deliberate
indifference claim.

### 2.   Analysis and Conclusion

Defendants do not assert that plaintiff failed to satisfy the objective prong of
the deliberate indifference standard - i.e. that plaintiff had a serious medical need.
Therefore, this prong of the deliberate indifference standard need not be discussed

21

any further.  Rather, the question to be answered is whether the defendants, while aware of plaintiff's serious medical need acted with deliberate indifference to that need.  There are essentially two actions (or inactions) that must be analyzed to determine if defendants' conduct rose to the level of deliberate indifference.  First, did the defendants' apparent failure to obtain additional information that could have led to the verification of plaintiff's other medications constitute deliberate indifference?  And, second did the failure to independently follow up with a physician rise to the level of deliberate indifference?  Kading testified that a generic "heart condition" would not be reported to a supervisor, (Dkt. 32-7, Pg ID 321) thus presenting the question whether the defendants' failure to report plaintiff's heart condition to a physician or supervisor while having knowledge of plaintiff's self-report of four prescriptions for heart medications, rose to the level of deliberate indifference.  Notably, the Supreme Court has opined that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

A review of relevant case law suggests that plaintiff's claims sound in mere negligence and do not rise to the level of deliberative indifference.  For example, in *Latona v. Pollack*, 2010 WL 358526 (W.D. Pa. 2010), the plaintiff alleged that he was denied is prescription medications for 14 days, but the court concluded that

22

the plaintiff failed to show any evidence rising to the level of deliberate

indifference.  In *Latona*, the record showed that the plaintiff sought medical

attention four times during the period in question.  The court concluded that:

> Although Plaintiff was denied his prescribed medications
> for 14 days, the record reflects that the denial was not
> malicious, sadistic, or even the result of apathy, but
> instead was due to the need to verify the treatment plan
> with the outside medical providers. Defendants' actions
> in this regard do not rise to the level of deliberate
> indifference here. *Ward v. Lamanna*, 334 Fed. Appx.
> 487, 491 (3d Cir. June 15, 2009) ("*Farmer* requires a
> state of mind more blameworthy than negligence. To
> violate the Cruel and Unusual Punishments Clause of the
> Eighth Amendment, a prison official must have a
> sufficiently culpable state of mind, which is similar to
> criminal law 'recklessness.'"); *McCray v. Prison Health
> Services, Inc*., 2007 WL 4181728, at *5-6 (M.D. Ala.
> 2007) ("Assuming, arguendo, that McCray may have
> experienced delays in the receipt of his medication [ ... ],
> he has not come forward with evidence showing that the
> named defendants deliberately withheld [ ... ] or knew of
> an escalating or emergency medical condition in regard
> to his prescriptions and failed to take steps to correct
> it.").

*Id*. at *10.  The *LaTona* court concluded that plaintiff did not show any evidence

of malice, despite being aware of that the plaintiff had been taking psychiatric

medications and was without them for 14 days.  *Id*.  Similarly, there is no evidence

in this record of malice.  In relying solely on information concerning plaintiff's the

last pharmacy to verify his prescriptions, defendants were following policy.  While

one might question the adequacy of that policy in relation to its intended goal,

23

ascribing malice or sadistic intent to its application overstates the circumstance. At best, the record indicates negligence.

Notably, in *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771 (6th Cir. 2012), the Sixth Circuit concluded that the delay in obtaining verification of prescription medications was due to mere negligence and not deliberate indifference.  The Court observed that "[a]t best, Bruederle might argue that Smith should have known he would suffer a seizure or should have taken more aggressive precautionary steps, but that is the language of medical malpractice, not deliberate indifference." *Id*. at 778 (citing *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) ("[I]t is not enough for a plaintiff to demonstrate a question of fact whether [officers] should have known" relevant details of an inmate's condition)).  Similarly, in this case, plaintiff's claim seems to turn on the notion that defendants should have known that the failure to quickly obtain the heart medications at issue would put plaintiff at risk for a heart attack.  Plaintiff offers no evidence to support that the nurses in question had such knowledge. More important, even if they did have that knowledge, their actions would rise only to the level of negligence/malpractice, not deliberate indifference, according to *Bruederle*.

The Court does not find the cases on which plaintiff relies to be particularly helpful to plaintiff's cause.  *Potvin* is factually distinguishable because not only

24

were the defendants aware of the medical condition at issue, they <u>deliberately</u>
<u>discarded</u> her medications.  Moreover, after it was determined that the medications
had been either destroyed or discarded, the officials in *Potvin* opted to release the
plaintiff from jail that same day, rather than hold her until her previously planned
release date two days later.  Thus, there was evidence that the officials were both
aware of facts from which an inference of a substantial risk of harm could be
drawn, and they in fact drew that inference.  The court also noted that the
defendants failed to offer any rebuttal to plaintiff's version of events.  Yet, in the
present case, there is no evidence that the defendants drew an inference of a
substantial risk of harm.

In *Flores*, the defendants had the plaintiff's medications in their possession
and failed to dispense them.  In addition, Judge Lawson pointed to specific
evidence of "vindictiveness" by the defendants which he concluded presented a
question of fact.  As to one defendant, there was evidence that Flores cried "help
me. Help me." but her cries were ignored.  As to another defendant, there was
evidence that he failed to give Flores her medications because he was too busy and
was aware that she had been "begging" for her medications.  As to yet another
defendant, there was testimony that the deputies were overheard stating that Flores
was not receiving her medications as punishment for the crimes she had
committed.  *Id*. at *15.  There is no such similar evidence in the present case,

which would tip the scales into finding a question of fact on the issue of deliberate indifference or that would push plaintiff's claim beyond that of ordinary negligence.

Lastly, *Clark-Murphy* is distinguishable because it involved an interlocutory appeal on the issue of qualified immunity. The Court concluded that while the evidence did not show that the defendants singly or as group showed deliberate indifference, for summary judgment purposes, they "*could have* perceived a substantial risk of serious harm to Clark." *Id.* at *290. Consequently, the defendants were not entitled to qualified immunity as a matter of law. The facts showed that all defendants were apprised that the plaintiff required psychiatric treatment, but took the position that since someone had notified healthcare, they did not need to worry about it further. Many were also aware of the water being turned off in the plaintiff's cell. The plaintiff later died of dehydration. Given the differing procedural posture (the record here has been fully developed through discovery), and the vastly different facts, the Court does not find this case to be helpful in analyzing the present circumstances.

For these reasons, the undersigned concludes that the conduct of which plaintiff complains does not rise to the level of deliberate indifference under the Eighth Amendment. Here, plaintiff has presented evidence showing that the defendants were responsive to his claim that he required specific medications,

26

albeit ultimately unsuccessful in verifying the prescriptions over the course of plaintiff's first five days of incarceration.  As such, plaintiff has not met the subjective prong of the inquiry by establishing that "the official knows of and disregards an excessive risk to inmate health or safety," which is to say "the official must be both aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference."  *Farmer v. Brennan*, 511 U.S. at 837.  Rather, plaintiff has established at most mere negligence, which does not rise or the level of an Eighth Amendment violation. Defendants' motion for summary should, therefore, be granted.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health*

27

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2); E.D. Mich. Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 14, 2017                        s/Stephanie Dawkins Davis
                                               Stephanie Dawkins Davis
                                               United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on <u>February 14, 2017</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov